IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| ZUMAR DUBOSE<br>ABDUSH DUBOSE<br>KARIEM DUBOSE | CRIMINAL ACTION<br>NO.  20-453-1-2-3 |

### MEMORANDUM OPINION

Defendants Zumar, Abdush, and Kariem Dubose[1] were indicted on mail fraud, wire fraud, bank fraud, and conspiracy to commit money laundering charges in connection with an alleged scheme to defraud the United States Postal Service ("USPS"), the United Parcel Service ("UPS"), and Citizens Bank by submitting false claims for lost packages.  Trial is scheduled to begin November 4, 2022, and the Government has filed four motions in limine.  The Court heard argument on these motions on September 30, 2022.

Only three of the Government's motions are addressed here.  The fourth seeks admission of business and public records; the Court reserves deciding this motion to allow the parties the opportunity to resolve the issue, or at least narrow its scope, through stipulations.[2]  Following a final pre-trial conference, Zumar, who is representing himself, filed on the document various letters which raised many of the issues previously addressed by the Court, evaluated—and found

---

[1] Because all three Defendants in this case are brothers with the same last name, they are referenced by their first names for ease of identification and clarity.

[2] Following a final pre-trial conference, Zumar, who is representing himself, filed on the docket various letters which raised many of the issues previously addressed by the Court, evaluated—and found wanting—the evidence he supposes the government will introduce at trial and challenged, among other things the grand jury process. Quite apart from their belated filing, in none of these letters did he cite any law in support of his contentions or the relief he sought.  Accordingly, the issues he raises are not properly before the Court.

1

wanting—the evidence he supposes the government will introduce at trial and challenged, among other things the grand jury process. In none of these letters did he cite any law in support of his contentions or the relief he sought. Accordingly, the issues he raises are not properly before the Court.

## I. MOTION TO PRECLUDE CERTAIN ARGUMENTS AND EVIDENCE

In its first motion, the Government argues pursuant to the law of the case doctrine that the Defendants should be precluded from introducing evidence along two lines: first, that the Defendants cannot be charged with the offenses in the superseding indictment because other statutes and regulations address fraudulent postal loss claims; and second, that no fraud occurred because USPS and UPS failed to identify the claims submitted by Defendants as fraudulent. Both lines of argument were raised several times by Zumar in pretrial motions.

On the first, Zumar repeatedly argued "that the superseding indictment 'alleges conduct that is not criminal activity,'" because other statutes or regulations were intended to govern fraudulent claims for postal losses. *United States v. Dubose*, 2022 WL 3030831, at *8 (E.D. Pa. Aug. 1, 2022). Zumar claimed the "intended violation" for the Defendants' alleged conduct can be found, *inter alia*, in 49 U.S.C. § 14706 (the "Carmack Amendment"), 18 U.S.C. § 288 ("False claims for postal losses"), various provisions of the Code of Federal Regulations, and/or the USPS Domestic Mail Manual. The Court rejected this contention:

> Zumar's argument seems to be that the activities alleged in the superseding indictment are not criminal because—in his view—they more appropriately fall under these laws as opposed to the wire and bank fraud statutes. But the laws Zumar cites are not the statutes under which the superseding indictment was brought and are not of consequence to his prosecution.
>
> Ultimately, the superseding indictment clearly states facts that, if believed to be true, would allow a reasonable jury to find that Zumar engaged in the crimes alleged. The fact that Zumar *believes* the alleged conduct is not criminal—and that he can point to other laws that exist which have nothing to do with the superseding

indictment—does not mean that he can succeed on a motion to dismiss under Rule 12(b).

*Dubose*, 2022 WL 3030831, at *8; *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Zumar also repeatedly made variations of the argument that the Government's charges are invalid because the indictment contains no allegation that USPS and UPS found any claims to be fraudulent or voided any issued checks. He made this argument in various motions, including motions seeking dismissal of the indictment under Federal Rule of Criminal Procedure 12, all of which were denied. The Court specifically addressed this argument in the context of Zumar's challenge to search warrants, stating that "Zumar appears to be arguing that if USPS and UPS did not discover a fraud then there is not fraud. This is nonsense." *Dubose*, 2022 WL 3030831, at *10. Reading between the lines of Zumar's argument, which is less than clear, the Government infers that he may argue that no fraud occurred because USPS and UPS were negligent in issuing claims checks. As the Government points out, this is not a defense to the offenses charged. *See United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct.").

The Government asks that argument and evidence on these two incorrect legal theories be precluded under application of the law of the case doctrine, which provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232-33 (3d Cir. 2002) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). However, it is

not necessary to address the question of whether the law of the case doctrine applies here, because these two theories remain legally unsustainable and to allow Defendants to refer to them during the trial risks confusing the jury.  Irrelevant evidence, which is what this motion concerns, is not admissible.  And, "it is the [trial] judge's responsibility to reduce the possibility of confusing the jury.  The judge may do so by deciding what law is applicable and prevent counsel from arguing law which the judge deems inappropriate."  75A Am. Jur. 2d *Trial* § 531 (2022); *see also Herring v. New York*, 422 U.S. 853, 862 (1975) ("The presiding judge . . . is given great latitude in controlling the duration and limiting the scope of closing summations. . . . [She] may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial."); *United States v. Sangster*, 2021 WL 2974635, at *5 (3d Cir. July 15, 2021) (district court did not err by precluding defense counsel from making the legally incorrect argument that the defendant legally possessed a firearm); *United States v. Leadbeater*, 2015 WL 567025, at *9 (D.N.J. Feb. 10, 2015) (precluding defense from arguing or eliciting testimony that fraud victims were negligent as such evidence and arguments "[did] not and could not negate liability" and "would confuse the issues for the jury").[3]

The Government's motion will therefore be granted, and Defendants are precluded from arguing, introducing evidence, or eliciting testimony that either (1) they should be acquitted because their conduct falls under other statutes or regulations, or (2) no fraud occurred because USPS and UPS were negligent in approving claims and issuing checks.

---

[3] In opposition to the Government's motion, Zumar raised various cursory constitutional objections—deprivation of his Sixth Amendment right "to a defense and fair trial," his First Amendment right to free speech, his Fourth Amendment right to privacy, and his Fifth Amendment rights due to "an ambiguity with 18 U.S.C. 288"—but improperly raised in that they make no cogent argument as to why or how these constitutional provisions may bear on these proceedings.

II.         MOTION TO AUTHENTICATE AUDIO RECORDINGS

In its second motion, the Government asks the Court to rule that recordings of eight jail calls purportedly made by Zumar to Abdush and Kariem are authentic under either Federal Rules of Evidence 104 and 901 or, in the alternative, under the standard established in *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975).[4] The Government also requests that it be allowed to use transcripts of these calls as an aid for the jury. Defendants, pointing to recurring discrepancies in the call log printouts that accompany the recordings and in the transcripts, oppose both requests.

### A. Witness Testimony Concerning the Recordings' Authenticity

Three witnesses testified in support of the Government's motion at the September 30 hearing: Eddie DeJesus, an employee of GTL/Viapath, the company that administers the inmate phone system at Essex County Prison; Phil Flor, a corrections and subpoena control officer at Essex County Prison; and Postal Inspector Francisco Morales, who requested the recordings and created the transcripts. Inspector Morales sent a subpoena for recordings of Zumar's calls to Officer Flor; Officer Flor, in turn, requested DeJesus to retrieve the recordings.

DeJesus testified that all inmate calls, except those made to attorneys, are recorded. To place a call, inmates must: (1) dial a phone number, (2) enter a six-digit telephone I.D. number, (3) say their name, and (4) enter a four-digit PIN. At the beginning of the call, both participants are advised that the call is being recorded. DeJesus then described the process of retrieving the recordings of Zumar's calls. DeJesus received a request from Officer Flor for recordings of calls made by Zumar while he was an inmate; the request identified Zumar both by name and by inmate I.D. number. DeJesus then downloaded recordings of the requested calls from the phone system and burned them to a C.D., which he provided to Officer Flor. When he downloaded the

---

[4] *See* Section II.B *infra* for analysis of the applicability of Rule 901 and *Starks*.

recordings, the phone system automatically generated two printouts cataloguing details of the calls.  Among other information, these printouts include: the date and time of the calls, the name and I.D. number of the inmate who placed them, the destination phone number, and the date the printout was generated.  DeJesus testified that neither the recordings nor the printouts were altered or modified in any way before being provided to Officer Flor.  Flor also testified that the recordings and printouts were not altered before being provided to Inspector Morales.

Finally, Inspector Morales testified that he listened to "hours and hours and hours of calls . . . [d]ozens upon dozens upon dozens" of times.  He testified that he identified Defendants as speakers in the calls based on his familiarity with their voices and the context of the calls.  Morales became familiar with Kariem's voice not only through listening to the recordings, but because he had a conversation with Kariem after arresting him.  As to the context of the calls, the speakers reference specific facts contained in the indictment against Defendants.  In one call, for example, the speaker Morales identified as Zumar references the specific counts charged against Zumar in the indictment ("like 10 counts of mail fraud, like 2 counts of bank fraud, like 1 conspiracy to commit money laundering") and tells the speaker identified as Abdush that he "is the co-defendant."  Allegations that the speaker identified as Abdush withdrew $68,000 from a bank account, the same amount of money the indictment charges that Zumar and Abdush conspired to launder, are also referenced.  The speaker identified as Kariem discusses postal boxes and a court notice concerning a motion submitted by "Kariem Dubose."

Morales also testified that he could identify Zumar because Zumar said his name at the beginning of the calls.  He identified Kariem because the outgoing destination number listed on the printouts was registered to him, and he was referred to by Kariem's nickname "Kur."  The outgoing destination number for the calls he identified as being made to Abdush is a prepaid cell

phone activated the day after a search warrant was executed on two properties linked to Defendants. Finally, Morales testified that he did not alter or modify the recordings in any way, and after listening to the recordings repeatedly, prepared the transcripts.

### B. Applicable Standard

As a preliminary matter, the parties dispute whether the motion is governed by the Third Circuit's decision in *United States v. Starks*. In *Starks*, the Third Circuit established that because recordings "are peculiarly susceptible of alteration, tampering, and selective editing," the government must "produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings." 515 F.2d 112, 121 (3d Cir. 1975). The *Starks* court laid out seven factors that guide the authentication analysis:

> A review of the authorities leads to the conclusion that, before a sound recording is admitted into evidence, a foundation must be established by showing the following facts:
> (1) That the recording device was capable of taking the conversation now offered in evidence.
> (2) That the operator of the device was competent to operate the device.
> (3) That the recording is authentic and correct.
> (4) That changes, additions or deletions have not been made in the recording.
> (5) That the recording had been preserved in a manner that is shown to the court.
> (6) That the speakers are identified.
> (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id.* at 121 n.11 (quoting *United States v. McKeever*, 169 F. Supp. 426, 430 (S.D.N.Y. 1958)).

However, the Federal Rules of Evidence, adopted shortly after *Starks*, establish a different, lower standard for authentication. Under Rule 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Questions of authentication under Rule 901 are treated "as matters of conditional

relevance according to the standards of Rule 104(b)," which can be satisfied under the "preponderance of the evidence standard." *See United States v. Browne*, 834 F.3d 403, 433-34 (3d Cir. 2016).  The "preponderance of the evidence" standard requires only a showing "that the fact sought to be proved is more probable than not," as opposed to the "clear and convincing evidence" standard which requires that a proponent show that "the truth of its factual contentions [is] highly probable."  *See Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (3d Cir. 2013); *Greenwich Collieries v. Dir., Off. of Workers' Comp. Programs*, 990 F.2d 730, 733 (3d Cir. 1993).

The Third Circuit has noted, without resolving, that "[i]t is unclear whether *Starks* remains relevant after the enactment of Fed.R.Evid. 901." *United States v. Tahn Le*, 542 F. App'x 108, 117 n.8 (3d Cir. 2013) (non-precedential); *see also United States v. Toler*, 444 F. App'x 561, 564 n.1 (3d Cir. 2011) (non-precedential) (declining to "comment on the relationship between Starks and Rule 901").  The Government argues that Rule 901 abrogated *Starks* and now provides the correct authentication standard.  However, as a hedge against the lack of clarity on this point in Third Circuit precedent, it contends that its evidence meets the higher *Starks* standard as well.  Defendants argue *Starks* applies.  As the Third Circuit has not overruled *Starks*, has not otherwise clarified its relationship to Rule 901, and has continued to reference its framework, *see Flood v. Schaefer*, 754 F. App'x 130, 133 n.3 (3d Cir. 2018) (non-precedential), the Government's motion will be evaluated under the higher *Starks* standard.

### C. Analysis Under *Starks*

A determination under *Starks* is required "[w]hen a colorable attack is made as to a tape's authenticity," which requires more than an unsupported assertion that there may be an authenticity problem.  *See Starks*, 515 F.2d at 122; *see, e.g.*, *United States v. Helmes*, 2022 WL

4300185, at *7 (D.N.J. Sept. 19, 2022) (denying defendant's request for a *Starks* hearing because he had not presented a colorable attack). Defendants made such a colorable attack at the September 30 hearing when they identified recurring discrepancies in the printouts generated when DeJesus downloaded the calls, shifting the burden to the Government to establish the recordings' authenticity by clear and convincing evidence.[5] Arguing that the Government has failed to satisfy two of the *Starks* factors: whether "the recording is authentic and correct" and whether "the speakers are identified," the Defendants assert that the Government cannot do so.

The Defendants challenge to the "authentic and correct" factor is based on two sets of discrepancies. First, the printout generated when DeJesus downloaded the requested calls bears a "Date/Time:(Generated)" legend of "01/01/1999." This is an obviously inaccurate date that predates the creation of the report by more than twenty years—Officer Flor requested on December 17, 2020 that DeJesus retrieve calls made by Zumar between the dates of November 4, 2020 and December 14, 2020. Second, Defendants identify discrepancies between the timestamps listed in the transcripts and the timestamps in the printouts. For example, the first transcript offered by the Government pertains to a call made on November 17, 2020. According to the transcript, this call occurred at "17:13:38," but according to the printout it took place at "17:14:58." Abdush identifies similar discrepancies in the transcripts of all eight calls, all of less than two minutes. The Government characterizes these discrepancies as minor, but Defendants contend that, combined with the Government's failure to provide an explanation, they pull the

---

[5] This case presents in an unusual posture. Although a *Starks* hearing is only required after a colorable attack, the Government affirmatively sought a pretrial authenticity determination and itself raised the *Starks* issue. In opposing the Government's motion, none of the Defendants made colorable attacks to authenticity: Kariem objected on the basis that admitting his codefendants' statements would be unfairly prejudicial to his defense, based on the assumption (later shown to be incorrect) that the calls were between Zumar and Abdush only; Abdush "reserve[d] the right to challenge the authenticity and accuracy" of the recordings pending receipt of their transcripts; and Zumar, without elaboration, asserted that the recordings constituted an "[a]uthenticity violation" implicating his Sixth Amendment rights. Only after the Government presented its authentication evidence did the Defendants raise the issue of the printout discrepancies.

recordings below the *Starks* threshold.

Notably, these discrepancies concern the printouts automatically generated by the inmate phone system rather than the recordings themselves, and the Government dismisses Defendants' challenges in part because the printouts themselves are not being offered as evidence. Based on Zumar's cross-examination of DeJesus during the motions hearing, Defendants' argument appears to be that the inaccuracies in the printouts are evidence of a more pervasive error within the GTL/Viapath system, error that may result in "mismatched" timelines or phone numbers. Their argument, read generously, appears to be that the system produces error such that what DeJesus queried in the system (calls made by Zumar within a specified date range) is not what the system actually returned.

But Defendants offer no explanation why these discrepancies sufficiently implicate the accuracy of the information in the printouts that substantively links the Defendants to the retrieved calls—Zumar's inmate I.D. number or the destination phone numbers. Moreover, the Government does not link Defendants to the calls based on the information included in the printouts alone, but also based on the content of the recordings themselves. And Agent Morales testified that Zumar identified himself by name at the beginning of each call, which the Defendants have not contradicted. Further, contrary to the contention by Abdush's counsel that the recordings only contain "generic conversation" about a criminal case, Agent Morales testified, and the transcripts reflect, that the recordings touch on details specific to the charges against the Defendants. It is troubling that the Government has not offered an explanation why these discrepancies are present and recurring, and Defendants can certainly raise these issues at trial through cross-examination of the Government's witnesses. *See United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) ("Authentication does not conclusively establish the

genuineness of an item; it is a foundation that a jury may reject."). But the Government has pointed to multiple other indicia demonstrating a high probability that the recordings retrieved by DeJesus, documented on the printouts, and reviewed by Agent Morales are of calls made by Zumar to his brothers.

As to the argument that Agent Morales' testimony that he identified the Defendants' voices is insufficient under *Starks*, Rule 901 allows authentication through "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5). Additionally, "it is well settled that telephone calls may be authenticated by circumstantial evidence as well as by direct recognition of the person calling." *United States v. Alper*, 449 F.2d 1223, 1229 (3d Cir. 1971). And courts in the Third Circuit have not subjected voice identification to the clear and convincing standard as part of the *Starks* analysis. *See United States v. Fratus*, 559 F. Supp.3d 420, 422 (E.D. Pa. 2021) ("Since Rule 901, courts within the Third Circuit 'generally apply the *Starks* factors to determine the authenticity of a tape recording and use a preponderance of the evidence standard to identify a speaker on the recording.'" (quoting *United State v. Davis*, 2018 WL 6524240, at *8 (E.D. Pa. Dec. 12, 2018))); *United States v. Kaboni*, 2013 WL 420334, at *4 (E.D. Pa. Feb. 4, 2013) (noting that "[t]he burden for identifying a speaker on a recording differs from the burden for the admission of tape recordings generally," and applying Rule 901). Agent Morales' testimony that he identified Defendants as speakers because of the context of the calls and familiarity with their voices, acquired by listening to the recordings and hearing Kariem's voice during his arrest, meets this standard. Accordingly, the Government's motion will be granted as to the recordings.

### D. Use of Transcripts

Finally, Defendants also seek to exclude use of the transcripts based on the timestamp discrepancies. Again, these discrepancies do not concern the actual substance of the transcripts, *i.e.*, what the transcripts claim was said. And the Government does not seek to introduce the transcripts as evidence, but rather as a listening aid for the jury to be accompanied by an instruction that in the case of any discrepancy between the transcript and the recordings, the recordings are to control. *See United States v. DiSalvo*, 34 F.3d 1204, 1220 (3d Cir. 1994) (affirming the use of transcripts where the trial judge gave a limiting instruction to the jury that the transcript was not evidence); *United States v. Adams*, 759 F.3d 1099, 1115 (3d Cir. 1985) (affirming the use of transcripts where the trial judge gave a limiting instruction that "the recording controlled over the transcript in case of error or ambiguity"). Thus, although the transcripts will not be admitted into evidence, the Government will be permitted to use them for its stated purpose.

### III. MOTION TO ADMIT IMPEACHMENT EVIDENCE UNDER RULE 609

The Government seeks to introduce two of Zumar's prior convictions as impeachment evidence under Rule 609, should he choose to testify.[6] Zumar received the first conviction in 2008 for burglary in violation of N.J. Stat. § 2C:18-2A(1), was sentenced to a three-year term of incarceration, and was released in November 2008. He received the second conviction in 2017 for theft by unlawful taking in violation of N.J. Stat. § 2C:20-3A, and received a sentence of two years' probation followed by 126 days' incarceration for a probation violation.

Under Rule 609, evidence of a prior conviction by a testifying defendant must be

---

[6] The Government initially also sought to introduce a 2010 conviction against Abdush, but later withdrew it in a letter to the Court. The letter followed the Court's request that the Government provide the date of Abdush's release, which was not included in the motion.

admitted if the offense was punishable by more than one year of imprisonment and "the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). However, "if more than 10 years have passed since the witness's conviction or release from confinement," the conviction is admissible only if "its probative value, supported by specific facts and circumstances, *substantially* outweighs its prejudicial effect." Fed. R. Evid. 609(b)(1) (emphasis added). Convictions older than ten years are therefore "presumptively excluded," *United States v. Caldwell*, 760 F.3d 267, 287 (3d Cir. 2014), and "will be admitted *very rarely* only in *exceptional circumstances*," *United States v. Shannon*, 766 F.3d 346, 352 n.9 (3d Cir. 2014) (emphasis in original).

The Third Circuit has not definitively resolved when the ten-year period is deemed to begin or end, but has indicated in dicta that it begins when the witness is released from prison and ends on the date of trial. *See United States v. Thomas*, 815 F. App'x 671, 677 & n.2 (3d Cir. 2020); *United States v. Hans*, 738 F.2d 88, 93 (3d Cir. 1984). The Government's initial contention that Zumar's 2010 conviction falls within the ten-year period, arrived at by using the 2018 "date of the charged offenses" as an endpoint, therefore appears incorrect. As a result, Zumar's 2008 burglary conviction is subject to Rule 609(b)'s more stringent analysis, while his 2017 conviction can be analyzed under Rule 609(a).[7]

The Third Circuit has outlined four factors to determine whether the probative value of a past conviction outweighs its prejudicial effect under Rule 609: "(1) the kind of crime involved; (2) when the conviction occurred; (3) the importance of the witness' testimony to the case; [and] (4) the importance of the credibility of the defendant." *Gov't of V.I. v. Bedford*, 671 F.2d 758,

---

[7] The convictions are for second- and fourth-degree offenses, both of which are punishable by at least a year of incarceration under New Jersey law. *See* N.J. Stat. § 2C:43-6 (second degree offenses are punishable by 5-10 years; fourth-degree offenses are punishable by up to eighteen months).

13

761 n.4 (3d Cir. 1982). The first factor considers both the impeachment value of the crime, which weighs in favor of admitting the prior conviction, and its similarity to the charged offense, which weighs in favor of excluding it. *See Caldwell*, 760 F.3d at 286 ("[T]he danger of unfair prejudice is enhanced if the witness is the accused and the crime was similar to the crime now charged, since this increases the risk that the jury will draw an impermissible inference" that the defendant committed the present offense because he or she committed the prior offense.). This factor weighs in favor of admitting both convictions, as "crimes that by their nature imply some dishonesty, such as theft, have greater impeachment value and are significantly more likely to be admissible." *Id.* The crimes of burglary and theft are also not so similar to the mail, wire, and bank fraud offenses charged against Zumar to require exclusion. *See United States v. Greenidge*, 495 F.3d 85, 98 (3d Cir. 2007) ("We also cannot conclude that the crime of stealing money from one's employer is so similar to the crimes of committing a fraud on a bank and money laundering" to warrant exclusion.).

The second factor weighs in favor of admitting the 2017 conviction and against admitting the 2008 conviction. Older convictions tend to have a greater prejudicial effect because they have less probative value, although this is moderated in cases where the defendant "has multiple intervening convictions." *Caldwell*, 760 F.3d at 287. In addition to the 2017 conviction, Zumar has three other convictions since 2008, for shoplifting and DUI.[8] While the age of Zumar's conviction weighs against admission, the effect is ameliorated by the fact of these additional convictions. The third and fourth factors are difficult to fully evaluate pre-trial.[9] Overall, two

---

[8] The Government disclosed these additional convictions in its letter withdrawing the motion as to Abdush.

[9] Past convictions should not be admitted where the defendant's testimony is crucial to his case, as this requires the defendant to "take[] a great risk by failing to testify in his defense"; however, they should be admitted if the defendant's credibility is key. *Caldwell*, 760 F.3d at 287-89. There is "tension" between these factors, as the importance of the defendant's credibility likely increases as the importance of his testimony does. *See id.* at 288 n.15. However, there are instances where the subject of the defendant's testimony can be established through other

14

factors weigh in favor of admitting Zumar's 2017 conviction, and it is therefore admissible. One factor weighs in favor of admitting his 2010 conviction, and one factor weighs against. As Rule 609(b) establishes a presumption against admission, overcome only in rare and exceptional circumstances, this deadlock will be resolved in favor of excluding Zumar's 2010 conviction.

## IV. CONCLUSION

The Government's Motion to Preclude Argument Contravening the Law of the Case and Blaming the Victims shall be granted; the Government's Motion to Admit Audio Recordings is granted; the Government's Motion to Admit Impeachment Evidence Under Rule 609 shall be granted in part and denied in part; and Zumar's four Motions raising various objections shall be denied as untimely, except to the limited extent described above.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____
**WENDY BEETLESTONE, J.**

---

evidence, lessening the risk to the defendant's case should he choose not to testify. *Id.* at 289. If the evaluation of these factors changes at trial, the parties may seek reconsideration of this ruling.