IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION<br>NO. 20-453-1-2-3 |
| v. | |
| ZUMAR DUBOSE<br>ABDUSH DUBOSE<br>KARIEM DUBOSE | |

## MEMORANDUM OPINION

Defendant Zumar Dubose was indicted on mail fraud, wire fraud, bank fraud, and conspiracy to commit money laundering charges in connection with an alleged scheme to defraud the United States Postal Service, the United Parcel Service, and Citizens Bank by submitting false claims for lost packages. Dubose had been proceeding *pro se* since February 2022. However, on November 14, 2022 the Court concluded after he continued a pattern of disruptive behavior on what would have been the first day of trial that he forfeited this right and appointed his standby counsel to represent him. The Government filed a Motion requesting a hearing to address Dubose's representation, which Dubose joined. The Motion will be denied, but given the concerns expressed by both parties, the Court writes now to address and clarify the reasons for the revocation of Dubose's *pro se* status.

I.     **BACKGROUND**

The original Indictment in this case, filed on December 3, 2020, named Zumar Dubose and his brother Abdush as defendants.[1] On December 9 and 16, two attorneys entered Notices of Appearance on Zumar's behalf—Joseph Howard and Kathleen Gaughan of the Federal Defender's Office. Although represented, Zumar submitted two *pro se* motions in February and

---

[1] Because the Defendants in this case are brothers with the same last name, they are referenced by their first names for ease of identification and clarity.

March 2021, the second of which requested Howard be removed as his counsel.[2]  The Government requested a status conference to address Zumar's representation, as did Howard.  In Howard's request, he asked "that the court allow [him] to exit the case" and suggested a competency assessment of Zumar.  He also described a "rift" with Zumar over strategy, explaining that he had rejected Zumar's "demand[s]" that he file motions "alleging incompetence, maliciousness, racial bias and other accusations" on the part of Assistant U.S. Attorney J. Jeanette Kang and raising various "failure to state a claim" defenses "solely based on [Zumar's] own reading of the indictment."  Parallel to these requests by his counsel, Zumar continued filing *pro se* motions.  On May 11, 2021, Howard filed a Notice of Withdrawal of Appearance; Gaughan filed another Notice of Appearance shortly afterward.  Zumar subsequently filed another *pro se* motion seeking to dismiss the indictment.

At a June 28, 2021 hearing before Judge J. Curtis Joyner, who was then presiding over this matter, Zumar asked to proceed *pro se*.  Judge Joyner ordered that he first undergo a competency evaluation, and Zumar requested that Gaughan remain as his counsel until the evaluation was completed.  Additionally, Gaughan and Abdush's counsel agreed to withdraw their clients' *pro se* motions.

On August 26, 2021, after the case had been reassigned to this Judge, the Government filed a Superseding Indictment adding charges and naming a third Dubose brother, Kariem, as a co-defendant.  On October 19, the Bureau of Prisons submitted its competency evaluation of Zumar, which concluded that he was competent to participate in legal proceedings, either *pro se*

---

[2] Zumar asserted that Howard had violated attorney-client privilege by revealing confidential information without his consent, had not advised him of his rights or Howard's duties, and had not advised Zumar "how I request him to move the court for my disability accommodations."  He also asserted that Howard had not followed his direction to file motions rebutting a detention order, asserting an alibi defense, and requesting dismissal based on prosecutorial misconduct.  These three arguments were raised by Zumar himself in his first *pro se* motion.

or represented by counsel.  Zumar continued filing motions and documents himself, including one on January 20, 2022, titled "Pretrial Memorandum" that stated he wished "to proceed *pro se*."  He repeated this request in another January 20 filing titled "Notice of Plea."

At a hearing on February 16, 2022, the Court arraigned the Defendants on the Superseding Indictment and addressed Zumar's requests to represent himself.  During this hearing, the Court engaged Zumar in a colloquy following the framework laid out by the Third Circuit in *United States v. Peppers*, 302 F.3d 120, 135-37 (3d Cir. 2002) on his wish to proceed *pro se*, after which the Court granted Zumar's motion to represent himself.  As part of this colloquy, the Court advised Zumar that "obstructionist behavior during pretrial proceedings" might lead the Court to conclude that he forfeited his right to self-representation.  Zumar responded that he understood.

Near the outset of the February hearing, Zumar indicated that he wished to raise various challenges to the indictment.  The Court informed him and co-defendant Abdush that the arraignment was not the proper setting to raise objections to the indictment.[3]  *See* Fed. R. Crim. P. 10 (setting forth the purpose of an arraignment).  After his request to proceed *pro se* was granted, and as the Deputy Clerk was attempting to record his plea as to Counts One through Ten of the Superseding Indictment, he nevertheless tried to raise this issue again.  Rather than pleading "guilty or not guilty" as prompted, he stated: "I plead lack of subject matter jurisdiction and move to be released from custody immediately."  The Court repeated its instruction that Zumar's *pro se* status did not excuse him from the obligation to follow court procedures and warned that his *pro se* status would be revoked if he did not respond to the question asked.

---

[3] Additionally, Zumar made a flippant remark during the hearing after the Court directed him to provide a citation supporting his contention that he was entitled to argue a challenge to the Court's jurisdiction at the arraignment, responding "[w]e can go and have a little cite all day."

Zumar responded: "Well, as I can tell it's a non-offense, so I am not guilty." The Deputy Clerk then asked Zumar if he pleaded guilty or not guilty to Counts Eleven through Fifteen, to which he responded: "It lacks all of the elements that's essential to charge me, so I plead not guilty." The Court warned Zumar again, "one more outburst like that, one more, and I will revoke your status." Zumar responded that he pleaded not guilty to those counts, and to the remaining counts in the indictment.

       The Court then turned to Zumar's outstanding motions, which had been filed *pro se* while he was still represented by counsel. The Court explained to Zumar that his motions "filed when you were represented by an attorney" were "non-lawyered submission[s]" and therefore not properly before the Court. The Court directed him to refile the *pro se* motions now that he was officially representing himself, which he agreed to do.

       In the months following the hearing, Zumar filed approximately twenty pretrial motions seeking, *inter alia*, to dismiss the indictment on various grounds, be tried without a jury, and prevent trial from being continued. The Court addressed and denied these motions in an opinion and order issued on August 1, 2022. Zumar then filed two additional motions raising similar arguments, which the Court again denied.

       A pretrial hearing was held on September 30, 2022, ahead of the originally scheduled October 3 trial date. However, because the parties represented to the Court that the trial could not be conducted in the five days originally scheduled, the Court continued trial to November 14. Despite the continuance, the Court heard argument on pretrial motions during the remainder of the hearing and directed the parties to be prepared to provide additional information on outstanding issues, if necessary, at a subsequent final pretrial hearing to be held in November. The Court also requested supplemental briefing from the parties on one of the Government's

motions *in limine*, which sought a pretrial determination of the authenticity of certain audio recordings.  The Court informed Zumar, however, that the deadline for pretrial motions had otherwise passed and, beyond that limited request, additional pretrial motions were not to be filed.

Zumar subsequently filed four documents.  The first was titled "Brief as requested by Hon. Beetlestone 9-30-22," but did not address the audio recordings issue beyond joining his co-defendants' responses.  Instead, it raised challenges to a different Government motion that sought pretrial authentication of business and public records, and also objected to the continuance of trial.  His other filings again raised a series of challenges and requested various forms of relief already ruled on in his timely pretrial motions (*i.e.*, moving to dismiss the indictment, terminate the Government's forfeiture of property, void search warrants, request a *Franks* hearing, and "impeach" a government agent for his grand jury testimony), and added requests to "amend or add an in person sworn oath testimony taken in court" and hold a "judicial hearing on adjudicative facts."  Except to the extent that he joined his co-defendants' briefs, these motions were denied for "belated filing" and for failure to cite any supporting law.

Ahead of the reset November 2022 trial date, another pretrial hearing was held on Tuesday, November 8.  Because Kariem was not present at the hearing, the Court stated that it would colloquy all three defendants on their trial rights on the following Monday, the first day of trial.  Immediately after this statement, Zumar asked "Can I take a trial colloquy today?"  The Court declined.

The Government turned to discuss the first of the issues to be addressed at the hearing—sequestration of case agents during trial.  After AUSA Louis Lappen mentioned the agents' names, Zumar interrupted to "object" and repeat his allegation that one agent, Adam Greiss,

5

"falsified Grand Jury testimony."  The Court instructed Zumar that he had "to abide by the rules of everyone else.  When the Government is talking, you do not speak."  Zumar responded that he understood.  When the Court later asked Zumar for his position on the agents' sequestration, he instead repeated his allegation that Greiss "fabricated" grand jury testimony.  He then attempted "to call on [Greiss] today to prove on the record" these allegations.  The Court directed him to only address the issue being argued—sequestration, not the various challenges to the indictment and grand jury proceedings that the Court had already considered and ruled on.  After hearing from the Government and all three defendants, the Court ruled on the sequestration issue.  Responding to this ruling, Zumar asked "[i]s it fine if I call the witness?"  The Court warned him: "I told you that if you continue to indicate that you do not understand these proceedings and disrupt these proceedings, I will immediately put your standby counsel in place.  You're getting very close to that."

The parties then moved on to discussing issues concerning Zumar's access to discovery materials.  During this discussion there was a nonverbal outburst from Zumar.  The Court again warned him that disruptive behavior could lead to the forfeiture of his right to self-representation:

> THE COURT: Stop.  Stop.  Stop.  I told you last time that you were close.  One more outburst like that and you will not be representing yourself.  Understood?
>
> ZUMAR: I understand, but I was –
>
> THE COURT: No.  Stop.  Stop.  I told you last time there is no snorting, there is no body language, there is no smirking. That is a critical component of what we do here.  One more thing like that, sir, one more thing and you are not representing yourself.  Understood?
>
> ZUMAR: Yes.

Subsequently, during argument from the parties concerning summary testimony from the case agents at trial, Zumar again asked to call Agent Greiss as a witness:

ZUMAR: I would like to call a witness.

THE COURT: What do you mean by that?

ZUMAR: I would like to verify a statement to see if it's consistent to even be any trial.

THE COURT: That's what you do at trial.

ZUMAR: Okay.

THE COURT: You just moved half a step closer. Understood?

ZUMAR: I understand.

Zumar later raised the issue of Greiss' testimony a third time, and was told by the Court that the subject should be raised on cross-examination at trial. Zumar continued to press the issue:

ZUMAR: But it is misconduct.

THE COURT: We already dealt with that. And you already had plenty of opportunity –

ZUMAR: It was new evidence.

THE COURT: Do not interrupt me, sir. Why do you think it's new evidence?

As the discussion continued, Zumar again interrupted the Court. The Court, in frustration, again warned him in perhaps overly colorful terms that failure to follow the Court's instructions would result in forfeiture of his right to self-representation:

THE COURT: I understand. So that's the kind of stuff –

ZUMAR: I have something that's material.

THE COURT: Don't interrupt me. Do not interrupt me. You're creeping towards not being able to represent yourself. You have to understand the rules. One of the rules is, guess who's the big dog? Who's the big dog here? Answer.

ZUMAR: Nobody in the room is the big dog.

THE COURT: I am. I am, right?

ZUMAR: I don't see nobody as a dog in here at all.

7

> THE COURT: Well, it means I am the boss. [It] means I am the boss and you do what I tell you to do. Understood? And if you don't follow the rules, then you will not be able to represent yourself. You are so close not being able to represent yourself. I have told you what the situation is, is that if you raise the issue properly during trial, during cross-examination, then you can cross-examine the agent on that issue, if you raise it properly. Understand?
>
> ZUMAR: May I raise the issue properly now?
>
> THE COURT: No. That is what I told you.
>
> ZUMAR: I understand.
>
> THE COURT: Do not interrupt me. There are rules on how you have to do these things. And so far you have illustrated, even though you have told me you have read the rules, because we did that in colloquy when you wanted to represent yourself, I am beginning to think you don't understand the rules or you don't want to obey them and that is a problem. Understood?
>
> ZUMAR: I understand.

On Monday, November 14—six days after the final pretrial hearing—trial was set to begin. That morning before jury selection, Zumar and his co-defendants appeared in their prison garb. At the prior hearing the question of providing the Defendants with street clothes for use during trial had been raised by Abdush's attorney, Jeremy Ibrahim. In light of Zumar's *pro se* status, Ibrahim had offered to supply both his client and Zumar with street clothes to wear at the trial. Given their appearance in prison uniforms, the Court asked Zumar a series of questions relating to his decision to appear in prison garb and the attendant risk of that decision. Zumar responded that he did not understand the questions:

> THE COURT: Now, we spoke [at the last hearing] about appearing in front of the jury in prison garb, and you indicated to me that you wanted to. Mr. Ibrahim indicated that he would purchase some clothes for you but I see you in your prison garb, so I am [ ] going to ask you some questions with respect to that. Do you understand that you have the right to wear street clothes during this trial?
>
> ZUMAR: Right now I'm confused and I don't understand anything.
>
> THE COURT: Answer the question.
>
> ZUMAR: I don't understand.

THE COURT: You're just answering my questions. The answer is yes or no. Do you understand that you have the right to wear street clothes during this trial.

ZUMAR: No, I do not understand.

THE COURT: You don't understand that you have the right to wear street clothes?

ZUMAR: That's correct.

THE COURT: Okay. You have the right to wear street clothes.

ZUMAR: I don't understand.

THE COURT: Do you understand that the Government cannot compel you to wear a prison uniform during this trial?

ZUMAR: I do not understand.

THE COURT: Do you understand that the Government is not asking that you appear during this trial wearing your prison uniform?

ZUMAR: I do not understand.

THE COURT: Do you understand that your co-defendant's counsel, Mr. Ibrahim, brought street clothes for you to wear during this trial?

ZUMAR: I do not understand.

THE COURT: Do you understand that you are entitled to the presumption of innocence during this trial?

ZUMAR: I do not understand.

THE COURT: Do you understand that wearing a prison uniform during the trial may risk biasing the jury against you?

ZUMAR: I do not understand.

THE COURT: Do you understand that wearing a prison uniform during the trial may risk visually standing you apart from your codefendants in the eyes of the jury?

ZUMAR: I do not understand.

THE COURT: Do you still choose to wear your prison uniform during the trial even though you have the right to wear street clothes?

ZUMAR: I do not understand.

>THE COURT: You still choose to wear your prison uniform during the trial even though the Government cannot compel you to do so?
>
>ZUMAR: I do not understand.
>
>THE COURT: You still choose to wear your prison uniform during the trial even though Mr. Ibrahim has provided you with street clothes?
>
>ZUMAR: I do not understand.
>
>THE COURT: You still choose to wear your prison uniform during the trial even though it may risk biasing the jury against you?
>
>ZUMAR: I do not understand.
>
>THE COURT: You still choose to wear your prison uniform during the trial even though it may risk setting you apart from your codefendants?
>
>ZUMAR: I do not understand.
>
>The Court then revoked Zumar's *pro se* status and appointed Gaughan to represent him.

Next, the Court attempted to conduct a standard pretrial colloquy of Zumar on his decision to go to trial. He again stated that he did not understand all of the questions being asked:

>THE COURT: Zumar, did the Government make any plea offer to you?
>
>ZUMAR: Absolutely not.
>
>THE COURT: Did you fully consider whether you should plead guilty or proceed to trial and did you fully consider the pros and cons of pleading guilty and going to trial?
>
>ZUMAR: I cannot plead guilty to a non-offense.
>
>THE COURT: Are you satisfied that you had enough time to consider the matter thoroughly?
>
>ZUMAR: I don't understand.
>
>THE COURT: Do you need more time to consider the question of whether to plead guilty or proceed to trial?
>
>ZUMAR: I don't understand.
>
>THE COURT: What don't you understand?
>
>ZUMAR: The questions.

>THE COURT: You don't understand the question. What is it about the question that you don't understand?
>
>ZUMAR: That I don't understand.
>
>THE COURT: Ms. Gaughan, you are now counsel for Zumar. Would you take some time to have a conversation with him about what he doesn't understand in this particular regard.
>
>ZUMAR: May I have another day to think about what they're asking me because I don't understand?
>
>THE COURT: No.
>
>ZUMAR: I don't understand[.] I don't understand.

Gaughan informed the Court that she needed additional time to prepare for trial and review discovery with Zumar; as all Defendants and the Government consented, trial was continued to April 2023.

Following the revocation of Zumar's *pro se* status, the Government filed the instant Motion asking the Court to hold a hearing on the status of Zumar's representation, colloquy him more thoroughly on his purported lack of understanding of the Court's questions, and enter more extensive findings on the record. Zumar, through counsel, joined the Government's request.

## II.   DISCUSSION

The Government's Motion raises two issues: (1) whether the Court articulated an adequate basis for terminating Zumar's self-representation, and (2) whether a further hearing is required. As to the first, Zumar's obstructionist conduct during the November 14 proceedings, combined with his prior actions, warranted the revocation of his *pro se* status. The Sixth Amendment "grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S 806, 819 (1975). "The right to represent oneself is not absolute, however; judges 'may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.'" *United States v. Noble*, 42 F.4th 346, 350 (3d Cir. 2022) (citing

11

*Faretta*, 422 U.S. at 834 n.46; *Illinois v. Allen*, 397 U.S. 337, 342-43 (1970)); *see also McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984) ("[A]n accused has a Sixth Amendment right to conduct his own defense, provided . . . that he is able and willing to abide by rules of procedure and courtroom protocol."); *Faretta*, 422 U.S. at 834 n.46 ("The right of self-representation is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law.").  Non-responsiveness by a defendant to questions from the Court is a recognized basis for terminating a defendant's self-representation.  *See Noble*, 42 F.4th at 351.

As the Government states and the Court agrees, the idea that Zumar genuinely did not understand the questions being asked is not credible.  Zumar has consistently participated in court proceedings and although he has raised procedurally improper or legally unsuccessful arguments, he has never displayed a lack of basic awareness or a failure to understand straightforward concepts like those raised in the Court's questions.[4]  Trial could not have proceeded fairly with a self-represented defendant, who later that day had the responsibility of participating in jury selection and likely making an opening statement, affecting a lack of understanding of basic questions.  *See Noble*, 42 F.4th at 350-51 (*pro se* defendant's non-responsiveness would make it "impossible to conduct a fair trial").  Furthermore, that these responses were an obstructionist delay tactic rather than honest expressions of confusion is further borne out by the pre-trial colloquy that followed the revocation of Zumar's *pro se* status, in which Zumar: stated he did not understand the question "[d]o you need more time to consider

---

[4] For example, during the *Peppers* colloquy after Zumar responded that he understood that punishment could be imposed "which is consecutive rather than concurrent," the Court asked Zumar to explain his understanding of the terms "consecutive and concurrent."  Zumar responded, "[o]ne is one after the other, and one is all at the same time."

the question of whether to plead guilty or proceed to trial," did not elaborate when asked what he did not understand about the question, and then requested trial be delayed so that he could "think about what they're asking me[.]"

Moreover, this conduct was the latest in a series of disruptive actions. Zumar had previously failed to follow the Court's instructions multiple times at the November 8 hearing when he interrupted AUSA Lappen and the Court, and when he repeatedly sought to question Agent Greiss. He received warnings after each of these incidents, and following other behavior, that he was approaching forfeiture of his self-representation rights. The Government argues that these warnings may have nonetheless been inadequate as they "occurred at previous listings and involved different issues" than non-responsiveness. In support, it cites a Sixth Circuit case for the proposition that "no action against an unruly defendant is permissible except after he has been fully and fairly informed that his conduct is wrong and intolerable, and warned of the possible consequence of continued misbehavior." *United States v. Pryor*, 842 F.3d 441, 450 (6th Cir. 2016). To the extent that the Sixth Circuit's rule has value here, Zumar was informed and warned against obstructionist behavior at the February 16 hearing and about the impropriety of his behavior on November 8. Further, his wrong and intolerable behavior began even prior to the November 8 hearing, as he demonstrated an unwillingness to follow court procedure by filing pretrial motions after deadlines had passed and continually re-raised arguments the Court had already ruled on and dismissed.[5] This was not "a single instance of disobedience . . . unaccompanied by open defiance or disruption . . . without prior warning" of the risks of

---

[5] It should be noted that this conduct has continued—Zumar has filed additional *pro se* motions that (a) raise these same arguments, (b) are untimely, and (c) are improper given that he is now represented by counsel. In orders denying these motions, the Court has repeatedly explained—as it did at the February 2022 arraignment—that it will not consider *pro se* motions by a represented defendant because defendants have no right to "hybrid" representation. *See McKaskle*, 465 U.S. at 183; *United States v. Turner*, 677 F.3d 570, 578 (3d Cir. 2012); *United States v. D'Amario*, 268 F. App'x 179, 180 (3d Cir. 2008).

revocation from the Court. *Noble*, 42 F.4th at 351 (quoting *United States v. Engel*, 968 F.3d 1046, 1051 (9th Cir. 2020)). Nor was this an instance "where disruption is predicted but has not occurred." *Id.* (quoting *United States v. Taylor*, 21 F.4th 94, 104 (3d Cir. 2021)). The Government's reliance on *United States v. Taylor* further confuses the issue. *Taylor*—which simply reaffirms the district court's responsibility to thoroughly evaluate a defendant's initial request to proceed *pro se* under the *Peppers* framework—does not apply here, in that it does not concern the revocation of a defendant's right to *pro se* representation. *See Taylor*, 21 F.4th at 102-04.

In short, Zumar's self-representation was revoked because the Court deemed his answers to basic questions to be non-responsive, deliberately obstructionist, an abuse of the dignity of the courtroom, and an avoidance of good faith engagement in the proceedings. Standing alone, the question as to whether Zumar's behavior in the pretrial conference would warrant a revocation of his *pro se* status would have been a closer call. But this was the culmination of similar behavior exhibited consistently throughout pretrial proceedings which, if allowed to continue (and, given what it had observed and heard, the Court had valid and grave concerns that Zumar had no plans to modify his conduct) would impede the progress of the trial potentially unfairly prejudicing his co-defendants.

As to the Government's second argument, its Motion collapses two separate concepts— waiver of the right to counsel and forfeiture of the right to self-representation—into each other by requesting that the Court further "engage with Zumar" on the revocation of his *pro se* status. Waiver of the right to counsel, *i.e.*, a defendant's initial request to proceed *pro se*, requires the court to "conduct an inquiry to ensure that the defendant understands the consequences and risks of waiving the right to counsel." *Noble*, 42 F.4th at 350 (citing *Peppers*, 302 F.3d at 133); *see*

*also Faretta*, 422 U.S. at 835 ("[I]n order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits [of representation by counsel]."); *Peppers*, 302 F.3d at 133 (The district court must "assure itself that the defendant fully apprehends the nature of the charges against him, the perils of self-representation, and the requirements that will be placed upon him."). Determining whether a defendant has later forfeited his or her right to self-representation is an analytically distinct question that, in contrast, focuses not on the defendant's understanding but instead on the defendant's conduct. *See United States v. Goldberg*, 67 F.3d 1092, 1100 (3d Cir. 1995) ("Unlike waiver, which requires a knowing and intentional relinquishment of a known right, forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right.").[6] Engaging Zumar in further discussion about his past behavior would not aid in evaluating the forfeiture of his self-representation, as his understanding or explanation of why he disrupted court proceedings is not the focus of the Court's inquiry.

The district court in *Noble* chose to hold a hearing specifically addressing the potential waiver or forfeiture of the defendant's right to self-representation. The Government requests a similar hearing in this case, but nothing in *Noble*, or the other cases cited by the Government, dictate that one is required. The focus of those cases is on obstructionist behavior by the defendant and that the district court demonstrate some patience before prohibiting self-representation. *See Noble*, 42 F.4th at 351. Here, both of those conditions have been met.

---

[6] In *Taylor*, which arose in a different context as discussed *supra*, the Third Circuit held that although obstreperous behavior by the defendant permits a district court to "truncate its *Faretta* colloquy," a defendant's "few attempts to advance arguments that ma[k]e no sense" do not on their own provide a valid basis to summarily deny a defendant's request to waive his or her right to counsel. 21 F.4th at 103, 105. Insofar as *Taylor* is instructive here, the Court based its decision on Zumar's unwillingness to follow its instructions rather than the merits of his arguments concerning either the indictment's purported deficiencies or the alleged untruthfulness of Greiss' grand jury testimony.

An appropriate order follows.

        **BY THE COURT:**

        */s/ Wendy Beetlestone*

        _____

        **WENDY BEETLESTONE, J.**