**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| | **NO.  20-453-1-2-3** |
| **v.** | |
| | |
| **ZUMAR DUBOSE, ABDUSH DUBOSE,** | |
| **KARIEM DUBOSE** | |

## <u>MEMORANDUM OPINION</u>

A jury convicted Defendants, siblings Abdush Dubose, Kariem Dubose, and Zumar

Dubose, of criminal offenses stemming from charges that they schemed to induce the United

States Postal Service ("USPS" or the "Postal Service") and United Parcel Service ("UPS") to

make reimbursement payments for items they claimed they shipped via these carriers and which,

the contend, the carriers lost.  Each Defendant challenges their convictions under Federal Rules

of Criminal Procedure 29, Fed. R. Crim. P. 29, and 33, Fed. R. Crim. P. 33, arguing that the

evidence that the Government presented at trial was insufficient to support the jury's verdict and

that the interest of justice requires retrial because the prosecution shifted the burden of proof to

them at closing argument and they were deprived of the opportunity to present certain defenses.

Because they cannot clear the high bar necessary to prevail here, Defendants' post-trial motions

will be denied.

### I.    BACKGROUND

Abdush was charged with ten counts of mail fraud (Counts One through Ten), in

violation of 18 U.S.C. § 1341, five counts of wire fraud (Counts Eleven through Fifteen), in

violation of 18 U.S.C. § 1343, and one count of conspiracy to commit money laundering (Count

Seventeen), in violation of 18 U.S.C. § 1957(a).  Zumar was charged with the same crimes and

was also charged with bank fraud (Count Sixteen), in violation of 18 U.S.C. § 1344(2).  Kariem

was charged in three of the mail fraud counts (Counts Eight through Ten), two of the wire fraud counts (Counts Fourteen and Fifteen), and the bank fraud count (Count Sixteen).[1]

The mail fraud counts in the indictment each concern specific USPS or UPS checks paid in reimbursement for fraudulent insurance claims (as well as a related debit card) that Abdush, Kariem, and/or Zumar caused to be mailed to post office ("PO") boxes and addresses that they controlled. The wire fraud counts each related to specific reimbursement checks that were deposited at a Citizens Bank Automatic Teller Machine ("ATM"), digitally scanned, and then electronically routed to the bank's data center in Rhode Island. The bank fraud count related to the checks that were deposited into one of multiple bank accounts that Defendants opened under many individuals' names, purporting to operate different businesses and charities. The money laundering conspiracy count was based in the totality of Defendants' alleged fraudulent conduct and predicated on the checks that undergirded the mail and wire fraud charges.[2]

The parties filed a bevy of pre-trial motions. In moving to dismiss the Indictment, Zumar argued, among other things, that the conduct for which he had been charged simply did not constitute criminal activity because it fell within the aegis of other laws, particularly the "Carmack Amendment," 49 U.S.C. § 14706. *United States v. Dubose*, 2022 WL 3030831, at *8 (E.D. Pa. Aug. 1, 2022). The argument was not viable and the motion was denied. *Id.* Prior to

---

[1] The Government dismissed one of the mail fraud counts, Count Eight, as to Kariem at the close of evidence at trial.

[2] Zumar Dubose initially requested to proceed *pro se*, and, after he was found competent to stand trial, the Court granted his motion. After some disruptions, the Court appointed stand-by counsel to represent Zumar. Despite then being a counseled defendant, Zumar continued to file numerous *pro se* motions. He continued to file *pro se* motions after his conviction, including a Motion for Judgment of Acquittal or New Trial, and also moved to remove his counsel and proceed *pro se*.

Following a post-conviction hearing, discussions between Zumar and his stand-by counsel, a week's delay for Zumar to consider his options, and colloquies pursuant to *United States v. Welty*, 674 F.2d 185 (3d Cir. 1982), and *United States v. Peppers*, 302 F.3d 120 (3d Cir. 2002), the Court granted Zumar's motion to remove counsel based solely on an irretrievable breakdown in the attorney-client relationship and granted his motion to proceed *pro se*. Zumar also elected in open court to adopt his counsel's previously-filed Motion for Judgment of Acquittal and New Trial, which the Court rules on here.

trial, the Government filed several motions in limine, one of which sought to preclude Zumar from arguing to the jury that he should be acquitted because the Carmack Amendment legitimized his conduct.  That motion was granted.

At the close of the Government's evidence at trial, Defendants moved for judgment of acquittal, which was denied.  The jury convicted Zumar on all counts, convicted Abdush on Counts One through Eight, Eleven through Thirteen, and Seventeen (acquitting him on Counts Nine, Ten, Fourteen, and Fifteen), and convicted Kariem on Counts Nine, Ten, and Fourteen through Sixteen.

## II.   LEGAL STANDARDS

### A.  Motions for Judgment of Acquittal

"A judgment of acquittal is appropriate under Federal Rule of Criminal Procedure 29 if, after reviewing the record in a light most favorable to the prosecution, [the court] determine[s] that no rational jury could have found proof of guilt beyond a reasonable doubt." *United States v. Baroni*, 909 F.3d 550, 561 (3d Cir. 2018), *rev'd on other grounds sub nom. Kelly v. United States*, 140 S. Ct. 1565 (2020); *see also United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc).  "Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).  And to avoid "act[ing] as a thirteenth juror," a verdict may only be overturned if it "falls below the threshold of bare rationality," *Caraballo-Rodriguez*, 726 F.3d at 431, or where "the prosecution's failure is clear," *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010). The evidence must not be viewed piecemeal; the question is instead "whether all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty

beyond a reasonable doubt." *Brodie*, 403 F.3d at 134 (quotation omitted).

### B.  Motions for New Trial

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008) (quotation omitted).  "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."  *Id.* at 1004-05 (internal quotation marks and citation omitted).  "Such motions are not favored and should be granted sparingly and only in exceptional cases."  *Id.* at 1005 (internal quotation marks and citation omitted).

### C.  Offense Elements

Whether a rational jury could have found Defendants guilty turns on whether the Government introduced sufficient evidence to prove each element of each count with respect to each Defendant beyond a reasonable doubt.

To sustain a conviction for mail fraud in violation of Section 1341, the Government must prove beyond a reasonable doubt that the Defendant: (1) knowingly devised (or attempted to devise) a scheme to defraud, *i.e.*, a scheme to deprive someone of money or property; (2) use of the mails in furtherance of that scheme; and, (3) specific fraudulent intent.  *See United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002), *as amended* (Sept. 30, 2002) (en banc); *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001), *abrogated on other grounds by Skilling v. United*

4

*States*, 561 U.S. 358 (2010).  Section 1341 "does not require the defendant's use of the mails to be an essential element of the scheme."  *United States v. Fallon*, 61 F.4th 95, 114 (3d Cir. 2023) (citation omitted).  Instead, "'[a]ll that is required is that the defendants knowingly participated in a scheme to defraud and caused a mailing to be used in furtherance of the scheme,'" *i.e.*, that the mailing was "'sufficiently closely related to the scheme'. . . and . . . depend[ed] in some way on the charged mailings."  *Id.* (quoting *Pharis*, 298 F.3d at 234; then quoting *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995)).  Section 1343's elements are similar to Section 1341's except, instead of a mailing, the Government must prove beyond a reasonable doubt "use of an interstate electronic communication or telephone call made in furtherance of the fraudulent scheme."  *Westawski v. Merck & Co.*, 215 F. Supp.3d 412, 428 (E.D. Pa. 2016); *see United States v. Pelullo*, 964 F.2d 193, 213 (3d Cir. 1992).

To sustain a conviction for bank fraud in violation of Section 1344(2), the Government must prove beyond a reasonable doubt that the Defendant: (1) knowingly devised (or attempted to devise) a scheme to obtain; (2) money or property owned by or in the custody or control of a financial institution; (3) by means of false pretenses or representations.  *Loughrin v. United States*, 573 U.S. 351, 355-56 (2014).  The Supreme Court has held that Section 1344(2) does not require proof that the defendant intended to defraud a bank, *id.* at 356, or proof that the scheme "created a risk of financial loss for the bank," *id.* at 366 n.9.  That said, because the bank fraud statute is not "a plenary ban on fraud, contingent only on use of a check (rather than cash)," there must be proof of "a relational component" between the money in the bank's custody and a defendant's lies.  *Id.* at 362.  Thus, "Section 1344(2)'s 'by means of' language is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control."  *Id.* at 363.  That false statement,

however, need not be made directly to the bank:

> [N]o less is [a] counterfeit check the 'means' of obtaining bank funds when a defendant . . . offers it as payment to a third party like Target.  After all, a merchant accepts a check only to pass it along to a bank for payment; and upon receipt from the merchant, that check triggers the disbursement of bank funds just as if presented by the fraudster himself . . . in either case, the forged or altered check—*i.e.*, the false statement—serves in the ordinary course as the means (or to use other words, the mechanism or instrumentality) of obtaining bank property.

*Id.* at 363-64 (footnote call omitted).

Finally, to sustain a conviction for money laundering in violation of Section 1957(a), the Government must prove beyond a reasonable doubt that the defendant: (1) engaged (or attempted to engage in) a "monetary transaction" as defined by law; (2) involving more than $10,000 in "criminally derived property;" (3) derived from a specific unlawful activity; (4) knowing that the transactions involved "criminally derived property."  *United States v. Flores*, 454 F.3d 149, 155 (3d Cir. 2006).  Conspiracy to commit money laundering requires proof beyond a reasonable doubt that: (1) two people agreed to form such a conspiracy; (2) "at some time during . . . the conspiracy, . . . one of its alleged members knowingly performed one of the overt acts charged in the indictment in order to further or advance the purpose of the agreement;" and, (3) the defendant intentionally joined the conspiracy knowing its purpose.  *United States v. Conley*, 37 F.3d 970, 976-77 (3d Cir. 1994) (citing *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989)).

## III.    THE GOVERNMENT'S EVIDENCE

At trial, the Government presented evidence that, starting in early 2019, Zumar and Abdush purchased hundreds of insured shipping labels that they attached to packages sent to and from mailboxes and homes they controlled in Florida, New Jersey, and Pennsylvania.  To establish the brothers had bought the shipping labels, the Government introduced photographs of

6

a single person (identified as Zumar by USPS Special Agent Eric Russ) buying many of them from USPS kiosks in the Philadelphia area. They also introduced bank records that included transaction data showing that Abdush and a company tied to him called "Seeds of Beauty, Inc." ("Seeds of Beauty") purchased the same type of labels in Florida.

Both USPS and UPS provided a service whereby customers can obtain carrier insurance for sent packages. If a package's contents are damaged or lost, the customer then can file a claim and receive payment for the value of the item shipped. USPS agent Adam Greiss testified that, based on the Postal Service's internal data, the shipping labels purchased by Abdush and Zumar were attached to packages the contents of which they claimed were "lost" and for which they filed reimbursement claims. Ultimately, summary claims data showed that, from March to September 2019, over 1,100 such insurance claims were filed with USPS, and 140 were filed with UPS.

The Government also introduced evidence that the packages that were sent did not contain what Abdush and Zumar represented that they contained. While the brothers indicated on the reimbursement forms they submitted that the packages contained valuable items such as high-end headphones, designer sunglasses, and expensive clothing, the packages did not in fact include such goods. Three different witnesses testified that the contents of the packages were not what the brothers represented it to be. Noel Osoria, a USPS employee in New Jersey, said that Zumar, in trying to explain that his packages had been delivered with some of its contents missing, opened one in front of him, revealing nothing more than a bag of sand. Another USPS employee, Bonnie Colon, testified that Abdush requested that she process a putative reimbursement claim for a broken iPad for $1,000, even though the envelope he presented looked nothing like the cushioned, wrapped boxes in which iPads usually are shipped. When she

opened the package for the first time in court, it turned out that there was only paper inside. Similarly, while he was on the stand, Agent Greiss was handed a flat envelope that, per the USPS Customer Inquiry and Claims Response System, was supposed to be carrying sunglasses. When he opened it, however, it contained only cardboard.

Further, although hundreds upon hundreds of claims were made, just a dozen receipts were recycled again and again to support each one. Some of these receipts (for, among other things, a $250 pair of Bose headphones and two pairs of sunglasses from Macy's, one for $270, and another for $245) were used to support over 150 unique reimbursement claims.

In addition, the claims' payees' addresses raised suspicions. For example, Postal Inspector Francisco Morales testified that Abdush applied to rent a PO box in Delray Beach, Florida, and listed his address as a home in a gated community there. Several USPS and UPS reimbursement claims would be sent to that PO box. Morales's search of relevant databases, however, showed that at the time, Abdush lived in Boynton Beach, Florida, not Delray Beach. The Government introduced summary evidence that the reimbursement checks were mailed to sixteen different addresses across three states. And while the checks were not necessarily made out to Abdush or Zumar, they did control these addresses. Some were houses that they or their relatives lived in. Others were mailboxes that they applied for in their own names, either at post offices or UPS stores. Over the course of the scheme, Abdush rented nine different mailboxes across Florida, to which hundreds of reimbursement checks were sent. Zumar similarly rented mailboxes at eight different UPS stores in Pennsylvania and New Jersey.

Apart from the large number of home and mailbox addresses connected to the claims, the claims were made in the names of an unusually large number of different people at the same addresses. Specifically, Abdush and Zumar used a laundry list of aliases (for example, "grip

winslow," "cru winslow," "jus kinkaid," "wi kinkaid" "no kikaid" "z gibson" "drunk wiseman" "wirp wiseman" "yercd wiseman" "whos wiseman," and "besall") to whom reimbursement checks should be sent.  Summary evidence reviewed by Special Agent Greiss showed that USPS received over 300 claims from a single mailbox in Lake Worth, Florida, to be paid to over 200 different people with several different last names, almost all for exactly $250.  The Government showed at trial that Abdush had rented this mailbox.

In addition, the Government introduced evidence that the proceeds from this scheme were deposited in a variety of checking accounts.  Most of these accounts were with Citizens Bank and were opened in the name of various organizations, including "Urmajesty Banktrucklift Solutions, Inc." ("Urmajesty"), Seeds of Beauty, "Miworld Three Inc." ("Miworld"), and "4 Entertainment Corporation" ("4 Entertainment").

Things began to fall apart for the brothers when Zumar had a run-in with police outside a Citizens Bank branch in Philadelphia in September 2019.  Citizens Bank risk manager Sean Blake testified that he received a notification from corporate security regarding activity at that branch, which prompted him to pull the relevant surveillance footage.  That footage showed Zumar standing at the ATM in the branch's vestibule making multiple withdrawals from the Miworld account and putting the cash in a large duffel bag.  Blake's subsequent investigation revealed that, although Miworld was listed as a charitable organization on the paperwork used to open the account, it lacked payroll or other indicia that it was a legitimate charitable organization.  Blake also discovered that several USPS checks, all for $250 and made out to different payees living at the same address (none of whom were the account holder), had been deposited into the account, activity that, based on his experience, raised red flags.  The Government corroborated Blake's testimony with extensive bank records showing deposit and

withdrawal activity for these accounts.

At first, only Zumar and Abdush were involved in the operation (they purchased the labels and sent the first reimbursement requests). But soon after Zumar's interaction with police outside the Philadelphia Citizen's Bank branch, Kariem stepped up. On September 9, Zumar texted Kariem, telling him that the money that he had withdrawn from Citizen's Bank had been "confiscated," so it was "time to rearrange our steps." He then texted Kariem that he wanted to Kariem to open a new business account at Citizens Bank. Five days later, on September 14, that is what Kariem did, opening an account at the same branch of the bank in the name of 4 Entertainment (as shown by surveillance tapes, the testimony of the teller who helped him to open the account, Tierra Cooper, and account records).

As was the case with Miworld, Citizens Bank personnel became dubious that 4 Entertainment was a legitimate entity. Kariem variously described 4 Entertainment as a "scholarship foundation," (although it had no public presence as a scholarship foundation) and a trucking company. This and other concerns led Citizens Bank to put a hold on the 4 Entertainment account within a month of it being opened. The bank informed Kariem of the hold in a letter in which it explained that it suspected checks from USPS made payable to people who were not 4 Entertainment had been requested and disbursed under false pretenses. Citizens Bank informed Kariem that in order to lift the hold, it would need notarized proof from the payees that they authorized each check to be deposited in the 4 Entertainment account.

Although Kariem shared the letter with Zumar and cautioned him against sending anything to the bank for fear that it was a "scam" to incriminate them, they nevertheless vociferously contested the hold, communicating with Blake often and faxing him what they said was the necessary verifying information. Unsuccessful in their efforts to convince the bank to

lift the hold, they cooked up a scheme to file a lawsuit which, they hoped, would force the bank to do so.  Zumar told Kariem in a text message that the plan was to have their niece Milan, who was one of 4 Entertainment's other trustees, sue him, which Kariem could then use to move to get the bank to remove the hold.  The Government's evidence showed that Kariem did just that, suing Citizens Bank in Camden County Superior Court in February of 2020.  But Kariem apparently was not prosecuting this lawsuit alone.  Zumar admitted in a text message to impersonating Kariem during a remote hearing for this suit.  By Zumar's own estimation, the judge thought that their suit was a fraud.

By October 2020, Defendants had aroused enough suspicion that postal investigators began to surveil homes tied to the scheme.  Investigators received and executed search warrants on homes in Atlantic City and Waterford Works, New Jersey, both of which were listed as the payee's address for dozens of the reimbursement claims.  The searches turned up large numbers of USPS and UPS packaging and shipping labels as well as fake identification cards.  They did not, however, yield evidence that legitimate businesses were operating out of the home— evidence such as company records, indications that customers were coming and going, or large quantities of goods such as the sunglasses or headphones that Defendants claimed had been lost.

## IV.    DISCUSSION

For the reasons set forth below, viewing the evidence in the light most favorable to the Government, the Court finds that a rational juror could have found beyond a reasonable doubt that Defendants: (1) engaged in a complex, multistate scheme to bilk USPS and UPS by pretending to have shipped expensive items and asking for reimbursement when their packages arrived containing no such goods; (2) deposited the proceeds from the scheme in bank accounts, misrepresenting the illicit source of the funds in the process (and, when a bank caught on to their

scheme and put a hold on one of the accounts, further lying to the bank and the courts); and, (3) subsequently withdrew that money from those accounts.  Accordingly, the Court finds that a rational jury could have concluded that the Government's evidence proved beyond a reasonable doubt each of the elements for each of the charges made against each of the Defendants.  Fed. R. Crim. P. 29.  Further, the interest of justice does not compel a different conclusion, as the Government did not improperly shift the burden of proof to Defendants, and the Court did not unlawfully deprive them of their right to put on a defense.  Fed. R. Crim. P. 33.  Therefore, Defendants' motions will be denied.

### A.  Abdush Dubose

Abdush Dubose challenges all of his convictions, arguing that: (1) in various ways, the Government did not put on sufficient evidence that the reimbursement requests were materially fraudulent; (2) he was unconstitutionally deprived of the opportunity to put on a defense; and, (3) the Government improperly shifted the burden of proof to him during its closing argument. As set forth below, none of these arguments is viable, and thus, his Motion for Judgment of Acquittal and Motion for a New Trial shall be denied.

### i.    *Materiality for Abdush's Fraud Convictions*

Abdush first argues that his mail and wire fraud convictions (Counts One through Eight and Eleven through Thirteen) cannot stand because the Government did not introduce evidence (1) "to establish that the payees were either fic[ti]tious companies or people;" (2) "that any of the receipts or receipt substitutes failed to be for actual items;" or, (3) "that the checks or envelopes that are specified in the counts of conviction were from claims made on items either not actually sent, or not worth the value claimed."  Based on his briefing, it appears that Abdush is challenging the sufficiency of the evidence with respect to the materiality element of his mail

and wire fraud charges.  That argument fails.[3]

For a jury to convict someone for violating either Section 1341 or Section 1343, the misrepresentation at issue must have been material.  *See Neder v. United States*, 527 U.S. 1, 25 (1999).[4]  A misrepresentation is material "if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  *Id.* at 16 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1988)).

A commonsense evaluation of the evidence could lead a reasonable juror to conclude that Abdush's misrepresentations were material.  *See, e.g.*, *United States v. Caldwell*, 81 F.4th 1160, 1176 (11th Cir. 2023) (citations omitted); *see also, e.g.*, Third Cir. Pattern Crim. Jury Instructions § 3.03 (Rev'd Dec. 2021).  The Government's evidence showed that the brothers had used just twelve genuine receipts for goods to support over 1,000 reimbursement claims.  In reliance on those claims, USPS and UPS issued over $280,000 in claims checks.  From this conduct alone, the jury could have concluded that Defendants lied on the insurance claims and that those lies at the very least had a "natural tendency" to induce USPS and UPS to issue reimbursements they otherwise would not have issued.  *Gaudin*, 515 U.S. at 509 (quotation omitted).  Viewing the evidence in the light most favorable to the Government, Abdush's lies

---

[3] To the extent that Abdush is making a more generalized sufficiency-of-the-evidence argument, that falls short too.  As discussed above, the jury heard testimony and was shown voluminous evidence showing that Abdush: (1) purchased insured shipping labels in his own name and in the name of entities that the jury reasonably could have concluded were not legitimate businesses based on bank records, testimony from Sean Blake, and the fruits of the Government's surveillance and searches; (2) requested reimbursement for "lost" items to be sent to mailboxes in Florida that he controlled; and, (3) supported those reimbursement requests with receipts for goods that the jury reasonably could conclude did not match what had ever been put in the packages based on testimony from Special Agent Russ about USPS's very low loss rates, summary evidence about Defendants' claims, and multiple witnesses' testimony about the packages that they had opened (some in front of the jury).  From this evidence, a reasonable jury could have concluded that Abdush knowingly submitted insurance claims under false pretenses intending to deprive USPS and UPS of their money.  18 U.S.C. §§ 1341, 1343.

[4] Courts "interpret 'identical language in the wire and mail fraud statutes *in pari materia*.'"  *United States v. Porat*, 76 F.4th 213, 218 n.3 (3d Cir. 2023) (quoting *Pasquantino v. United States*, 554 U.S. 349, 355 n.2 (2005)).

were material.[5]

### ii. *Deprivation of the Carmack Amendment Defense*

Next, Abdush argues that the Court's order on the Government's motion in limine barring him from presenting a defense based on the Carmack Amendment was error.  Motions for judgment of acquittal under Federal Rule of Criminal Procedure 29, which direct the Court only to weigh the government's evidence, do not provide a basis for relitigating the Court's ruling on the motion in limine.  Fed. R. Crim. P. 29(a).  Thus, the Court will vacate Abdush's convictions only if, under Federal Rule of Criminal Procedure 33, "the interest of justice so requires."  Fed. R. Crim. P. 33(a).

To review, the Government's motion in limine to bar the Defendants from referencing the Carmack Amendment before the jury was granted.  *United States v. Dubose*, 639 F. Supp.3d 503, 507, 509 (E.D. Pa. 2022).  Abdush argues that this decision prevented him from presenting "a defense under the Carmack Amendment that could have swayed the jury on the issue of intent."  His argument proceeds as follows: The Carmack Amendment "allows a carrier to require that all claims for loss or damage by a shipper be made in writing within nine months from the date of the loss.  It also allows a carrier to limit its liability if all prerequisites are met."  Given this understanding of the Carmack Amendment, Abdush argues that he "intended to offer as a defense his reliance on the terms of the Carmack Amendment when he submitted claims to the various carriers[,]" and that "[i]n light of the lack of material evidence on the wire and mail fraud counts, the jury would have had to consider whether [such] reliance . . . mitigated any willful

---

[5] Because there was sufficient evidence to support Abdush's mail fraud and wire fraud convictions, Abdush's argument that he must be acquitted of or be granted a new trial on his conspiracy charge has no legs.  Conspiracy to commit money laundering requires proof beyond a reasonable doubt that the defendant attempted to conceal "criminally derived property."  18 U.S.C. § 1957(a).  Abdush's argument attacking his conspiracy conviction is that because he had not committed mail or wire fraud there was no such property.  His premise is incorrect, so his argument fails.

participation in any scheme with knowledge of its fraudulent nature."  In other words, he maintains that if he had an "honest belief" that what he was doing was lawful, and the jury believed him, they would not have convicted him.  He argues that barring him from bringing the Carmack Amendment and his belief about its implications for his criminal case to the attention of the jury thus resulted in a violation of his due process rights.

True, an overly rigid application of evidentiary rules that bars someone from putting on a defense is a due process violation.  *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).  But, as the Court explained in its opinion granting the Government's motion in limine and reiterates here, the Carmack Amendment could not provide a defense to liability for any of the charges, so *Chambers* is not implicated.  *See Dubose*, 639 F. Supp.3d at 509.  The Carmack Amendment replaced a state-by-state liability system for ground carriers' liability for goods damaged while in transit with a uniform system establishing a default liability rule and giving carriers and shippers the option to contract for an alternate scheme.  *Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am.*, 762 F.3d 332, 334-35 (3d Cir. 2014).  Its existence has no bearing on whether Defendants are guilty of criminal mail fraud.

What Abdush appears to be arguing, at bottom, is that he engaged in this scheme under the erroneous impression that the Carmack Amendment provided a defense to criminal liability or rendered his actions non-criminal.  This is referred to as a mistake of law.  "The general rule"—subject to exceptions not relevant here—"that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."  *Cheek v. United States*, 498 U.S. 192, 199, 203 (1991) (citations omitted); *see also, e.g.*, *United States v. Smukler*, 991 F.3d 472, 484-85 (3d Cir. 2021).  So too here.  Reliance on the Carmack Amendment therefore would not have "mitigated any willful participation in any scheme" by

Abdush and, thus, the interest of justice does not counsel a new trial.[6]

### iii.    Burden Shifting in Closing Argument

During closing argument, the Government told the jury:

> Let's not forget, before we talk about what they do with those postage labels, what possible legitimate reason would these guys ever have to buy that many insured postage labels?  There's no legitimate reason, not a drop of evidence that you ever saw in this case, that would provide one legitimate basis for all of those purchases.

Abdush, Kariem, and Zumar all argue that this statement unconstitutionally shifted the burden of proof from the Government to them.  But this was not unconstitutional burden-shifting, nor prejudicial error.

"[T]he prosecution may not . . . improperly suggest that the defendant has the burden to produce evidence."  *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996) (citations omitted).  But "comment[ing] on the failure of [a defendant's] attorney to point to any evidence in the record supporting his theory of what occurred . . . does not implicate any of the burden-shifting concerns . . . ."  *Id.*  A prosecutor thus may "focus the jury's attention on holes in the defense's theory" without offending the constitution."  *Id.*

That is what the Government did in its closing argument—pointed the jury towards the permissible inferences that they could draw from the evidence.  Given the voluminous evidence that Miworld, 4 Entertainment, and their other purported businesses had no legitimate operations, the Government was entitled to argue—and the jury was entitled to conclude—that Defendants had no legitimate use for over 1,000 insured postage labels.  This did not shift the burden of proof, so this argument is not grounds to vacate any of Defendants' convictions.

---

[6] To the extent that Abdush is arguing that, given the existence of the Carmack Amendment, the Government should not have brought the charges against him that it did, that argument has no purchase either: "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

In sum, Abdush Dubose's Motion for Judgment of Acquittal or New Trial will be denied in full.  He has not shown that, viewing the evidence in the light most favorable to the Government, no rational jury could have convicted him on any of his charges, and the interest of justice does not require a new trial.

### B.  Kariem Dubose

Kariem Dubose challenges each of his convictions, albeit by raising different arguments. He first argues that the Government did not put on sufficient evidence of his intent to defraud USPS and UPS, so his convictions for mail fraud under Section 1341 and wire fraud under Section 1343 cannot stand.  He next, along with Zumar, argues that his conviction for bank fraud under Section 1344(2) cannot stand because the Government did not put on sufficient evidence that he intended to defraud USPS or UPS and because the bank would not have lost any money because of Defendants' scheme.[7]

### i.   *Mens Rea for the Mail and Wire Fraud Convictions*

Kariem attacks his mail fraud (Counts Nine and Ten) and wire fraud (Counts Fourteen and Fifteen) convictions by arguing that the Government failed to prove that he had the necessary mens rea for the offense because "there was no direct evidence presented that showed Kariem acted with the intent to defraud or had knowledge of the scheme to defraud the USPS or UPS as of September 20, 2019."  That argument fails with respect to each of these convictions.

To review, Count Nine related to USPS Claim Check 313529496 for $249.99 mailed via USPS on or about September 20, 2019, to a UPS box rented under Zumar's name.  Count Ten related to a Citizens Bank debit card for the 4 Entertainment account mailed via USPS on or about September 21, 2019, to Kariem's home address.  Counts Fourteen and Fifteen related to

---

[7] Kariem also presses Abdush's burden-shifting argument.  For the same reasons explained above, this argument is unavailing as to Kariem too.

the electronic transmission of scans of USPS claim checks 313499143 and 313499146 to

Citizens Bank on or about October 2, 2019.

Viewing the evidence in the light most favorable to the Government, the jury here could

have concluded that Kariem knew about his brothers' scheme by September 20, 2019 and acted

with the requisite intent to defraud at that time.  A jury may permissibly infer a defendant's state

of mind based on circumstantial evidence.  *See United States v. Riley*, 621 F.3d 312, 333 (3d Cir.

2010) (citing *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).  There was more

than enough evidence for the jury to do exactly that here.  As discussed above, the jury saw

evidence that Kariem, right after Zumar told him that he had had some trouble with the police

after withdrawing money from the Miworld account, opened the 4 Entertainment account at

Zumar's request.  Even without making a valid inference about Kariem's knowledge of Zumar's

prior illegal conduct by virtue of their close relationship,[8] the jury still could have concluded that

Kariem knew that 4 Entertainment was a fraudulent account based on their exchange and the

contradictory purposes of the business that he shared with Citizens Bank personnel.

Moreover, after Zumar texted Kariem that he planned to "drop some checks in" the 4

Entertainment account, for which Kariem could keep $2,000 as payment, Kariem reacted in a

way that could be read to betray his knowledge of the scheme's illicit nature.  Instead of

revealing any surprise, Kariem simply advised Zumar, "don't burn the account" (as had

happened with Miworld and its predecessors).[9]  In other words, the jury rationally could

conclude Kariem knew that the account had to remain open for Defendants' scheme to continue

---

[8] *See United States v. Pearlstein*, 576 F.2d 531, 541 (3d Cir. 1976) ("A continuing personal or professional
relationship between the principal architect[] of the fraudulent scheme and the defendant[] might be relevant to show
that the defendants were aware of the principal['s] wrongful purpose.").

[9] From this text message, the jury also could have inferred that Kariem "knowingly cause[d]" the checks underlying
Counts Nine and Ten "to be delivered by mail."  18 U.S.C. § 1341.

to bear fruit.  From this circumstantial evidence, the jury could validly infer that, even if Kariem did not actively further his brothers' fraudulent scheme until he opened the 4 Entertainment account, he knew full well what they were doing.

The jury also permissibly could have rejected Kariem's argument that he should be acquitted because he did not know the relevant checks were issued by USPS and UPS and therefore must have lacked specific intent to defraud them.  As discussed above, after Citizens Bank put a hold on the 4 Entertainment account, Kariem received a letter that explained in no uncertain terms that the bank believed that deposited USPS claim checks had been requested and disbursed under false pretenses.  When Kariem forwarded the letter to Zumar, Kariem did not express any surprise about its contents.  Quite the opposite, in fact.  He instead warned Zumar not to send any verifying information to Citizens Bank to release the hold because "this is a scam to make it a[n] indi[c]table offense."  The Government therefore put on sufficient evidence from which the jury could have concluded that Kariem had the necessary intent to defraud when the check and debit card underlying Counts Nine and Ten were mailed.

Finally, Kariem's attacks on his wire fraud convictions under Section 1343 largely echo his arguments on his mail fraud convictions and fail for the same reasons.  These wires were sent after September 14, the date by which the Government's evidence suggested Kariem joined his brothers' scheme.  Therefore, the jury permissibly could have inferred that he acted with the necessary intent to defraud USPS and UPS when the relevant checks were sent electronically.

### ii.    *Bank Fraud*

Next, Kariem, joined here by Zumar, launches legal and factual attacks on his bank fraud conviction.  First, similar to his other fraud convictions, Kariem argues that the Government did not produce sufficient evidence that he acted with the fraudulent intent to sustain his Section 1344(2) conviction.  But for similar reasons to those stated above regarding his mail and wire

fraud convictions, a rational jury could have concluded that Kariem acted with intent to defraud when he opened a checking account for an organization that was neither a scholarship foundation nor a trucking company and made repeated fraudulent attempts to lift Citizens Bank's hold on the account once the bank realized it was being used as part of Defendants' scheme.[10]

In addition, Kariem and Zumar both argue that Section 1344(2) is inapplicable on these facts. Kariem argues that this is the case because Citizens Bank "was merely a conduit" for the fraudulent scheme and "[t]he bank would not have suffered any loss as the result of [his] actions." Zumar frames the argument differently, arguing that bank's involvement in Defendants' scheme "was too incidental or tangential to convict him for bank fraud" under Section 1344(2).

Neither argument prevails here. To review, to convict someone for violating Section 1344(2), the Government must prove beyond a reasonable doubt that a defendant "knowingly execut[ed], or attempt[ed] to execute, a scheme or artifice . . . to obtain any of the moneys . . . owned by, *or under the custody or control of*, a financial institution, *by means of* false or fraudulent pretenses." 18 U.S.C. § 1344 (emphasis added). The Supreme Court has rejected the notion that the Government must "prove that the defendant's scheme created a risk of financial loss to the bank." *Loughrin*, 573 U.S. at 366 n.9. "[N]othing like that element appears in the clause's text." *Id.*; *see also United States v. Sater*, 2023 WL 3734962, at *3 (3d Cir. May 31, 2023) (not precedential). Thus, text and precedent foreclose Kariem's argument.

Turning to Zumar's argument, a rational jury could have concluded that there was a sufficient connection between Zumar's misrepresentations and his scheme to obtain money in

---

[10] And, contrary to Kariem's suggestion that there was no evidence that he "prepared . . . the bank documents that w[ere] used in opening the bank account or attempting to lift the hold," the Government introduced the signed Citizens Bank paperwork by which he opened the 4 Entertainment account and his communications in attempting to lift the hold.

Citizens Bank's custody.  As discussed above, the Government needed to prove beyond a

reasonable doubt that his lies were "the mechanism naturally inducing" Citizens Bank "to part

with money in" the 4 Entertainment account.  *Loughrin*, 573 U.S. at 363.  Those lies did not need

to be directed at Citizens Bank alone.  *See id.* at 363-64.

The Government put on sufficient evidence from which a rational jury could have

concluded that Zumar's lies fit the bill.  Sean Blake testified that he spoke on the phone with

someone whom surveillance evidence allowed the jury to identify was Zumar pretending to be

Kariem.  In those conversations, Zumar—identified by Blake based on his experience speaking

with him on the phone and by cross-referencing his phone calls with surveillance footage at the

bank—impersonated the 4 Entertainment account holder (Kariem) and falsely insisted that the

reimbursement checks were valid.  Text messages between Zumar and Kariem corroborated the

fact that Zumar made at least three such phone calls to Blake.[11]  Moreover, the jury could have

concluded that Zumar was behind the lawsuit attempting to induce Citizens Bank to release the

---

[11] The jury could rely on these text messages to convict Zumar of bank fraud without offending his Fifth
Amendment rights.  Although these specific text messages and phone calls are not expressly mentioned in the
Indictment, their introduction (and the jury's reliance on them) does not constitute a constructive amendment or a
prejudicial variance that would require vacating Zumar's bank fraud conviction.

A constructive amendment occurs when "the evidence and jury instructions at trial modify essential terms of the
charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant
for an offense differing from the offense the indictment returned by the grand jury actually charged."  *United States
v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006) (citations omitted).  Where the prosecution presents evidence of
conduct not charged in the indictment, but the jury is instructed to convict the defendant based only on conduct
charged in the indictment, no constructive amendment has taken place.  *Id.* at 260.  Here, the jury instructions as to
Count Sixteen tracked the conduct alleged in the Indictment, so no constructive amendment took place.

At most, reliance on these text messages to sustain the conviction would constitute a non-prejudicial variance
between the evidence adduced at trial and those alleged in the Indictment.  *Id.* at 261 ("There is a variance 'where
the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from
those alleged in the indictment.'"  (quoting *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985))).  A
variance is not prejudicial and thus does not require vacating a conviction when the indictment "sufficiently informs
the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial."
*Id.* at 262 (quoting *United States v. Schoenhut*, 576 F.2d 1010, 1021-22 (3d Cir. 1978)).  Here, the Indictment
discussed at length Kariem's and Zumar's efforts to lift the hold on the 4 Entertainment account—and made clear
that the Government planned to rely on text messages between the two of them and calls to Citizens Bank to show
that these attempts were made under false pretenses—so Zumar received sufficient notice of the nature of the
allegations against him, and he was able to prepare his defense without risk of surprise at trial.

hold under false pretenses.  A copy of the lawsuit was recovered from the search of his home, and the Government introduced text messages between Zumar and Kariem showing that Zumar not only hatched the plan to sue the bank, but also appeared in court impersonating him.  This misrepresentation by itself could sustain Zumar's bank fraud conviction.  Therefore, a rational jury could have concluded that Zumar lied to Blake in an attempt to induce Citizens Bank to lift the hold on the account, so that he and his codefendants could keep withdrawing money in the bank's custody from it, satisfying the "relational" limitation articulated in *Loughrin*.  *Id.* at 362.

In sum, Kariem Dubose's Motion for Judgment of Acquittal and Motion for New Trial will be denied in full.  He has not shown that, viewing the evidence in the light most favorable to the Government, no rational jury could have convicted him on any of his charges, and the interests of justice do not require entering judgment of acquittal.[12]

### V.      CONCLUSION

For the forgoing reasons, the Court will deny Defendants' motions for judgment of acquittal and a new trial.

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*
_____

**WENDY BEETLESTONE, J.**

_____

[12] In his Motion for Judgment of Acquittal and Motion for New Trial, Zumar Dubose advanced only two arguments: (1) that there was insufficient evidence from which the jury could have concluded beyond a reasonable doubt that there was a relationship between the lies he had told Citizens Bank and his scheme to obtain money in the bank's custody; and, (2) that the interest of justice required he be retried because the Government unlawfully shifted the burden to him in his closing argument.  Each of these arguments has been addressed in the context of his brothers' post-conviction motions and is unavailing.  Therefore, Zumar's Motion for Judgment of Acquittal and Motion for New Trial will be denied as well.